UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DANIEL LUCERO,<br><br>   Plaintiff,<br><br>   v.<br><br>ISABEL GUZMAN, *et al.*,<br><br>   Defendants. | Case No. 2:21-cv-00915-RFB-MDC<br><br>**ORDER** |

Before the Court is Defendants' Isabella Guzman and the U.S. Small Business Administration (ECF No. 78) Motion for Summary Judgment. For the following reasons, the Court grants the Motion.

### I.  PROCEDURAL HISTORY

On May 11, 2021, Plaintiff Daniel Lucero commenced this action by filing his Complaint. (ECF No. 1). On September 20, 2021, Defendants Isabel Guzman, Administrator of the U.S. Small Business Administration ("SBA") and the SBA filed their first Motion to Dismiss. (ECF No. 13). On August 16, 2022, the parties filed a Stipulation for Plaintiff to amend his complaint, which the Court granted the same day, and denied Defendants' first Motion to Dismiss as moot. (ECF Nos 34-35). Plaintiff filed his First Amended Complaint ("FAC") on August 30, 2022. (ECF No. 37). On October 28, 2022, Defendants filed their Motion to Dismiss the FAC. (ECF No. 40). The Motion to Dismiss the FAC was fully briefed as of December 12, 2022. (ECF Nos. 45, 48). On August 21, 2023, the Court held a hearing on the pending Motion to Dismiss and granted Defendants' Motion as to Plaintiff's Title VII race discrimination, Age Discrimination in employment Act, and Rehabilitation Act disability discrimination causes of action. (ECF No.

62). The Court denied the Motion to Dismiss Plaintiff's Title VII retaliation claim. Id.

On June 14, 2024, Defendants filed the instant Motion for Summary Judgment. (ECF No. 78). As of October 31, 2024, it was fully briefed. (ECF Nos 85-89, 101-102). On January 15, 2025, the parties filed a Proposed Joint Pretrial Order. (ECF No. 107).

The Court's Order on the pending Motion for Summary Judgment follows.

## II. FACTUAL BACKGROUND

The Court makes the following findings of undisputed and disputed facts.

### A. Undisputed Facts

Plaintiff Daniel Lucero was the Deputy District Director of the Nevada District Office ("NDO") of the Small Business Administration ("SBA") in Las Vegas, Nevada from October 2014 to December 21, 2017, when he was terminated.

Janan Raju served as Acting District Director ("ADD") for the NDO in Las Vegas from January to October 2017. During the time he served as ADD, Raju was Plaintiff's first-level supervisor. Robert Blaney was the Acting Regional Administrator for Region IX of the SBA, and Plaintiff's second-level supervisor.

Sabrina Abousaleh was Plaintiff's subordinate who filed an Equal Employment Opportunity ("EEO") complaint against Plaintiff in 2016. On December 7, 2016, Plaintiff was interviewed by an EEO Program Manager as part of the EEO investigation based on the complaint of another subordinate, Nanette Rudolph.

On January 3, 2017, Plaintiff sent an email to the SBA Office of Field Operations, cc'ing others, discussing Ms. Abousaleh's performance and conduct issues and Plaintiff's dissatisfaction with the SBA response. He referenced the EEO complaint filed by Ms. Abousaleh as follows, "EEO submitted in June and Dec 2016 for Ms. Abouseleh . . . Status: No Action taken. Ms. Abousaleh is advised from EEO this will take 2 yrs or longer."

Plaintiff sent a letter to Ms. Abousaleh, dated January 19, 2017, informing her that he was withholding her scheduled pay grade increase for January 25, 2017, for performance below "Meets Expectations, Level 3." On January 20, 2017, Raju instructed Plaintiff not to involve

- 2 -

1  himself with the ladder promotion of Ms. Abousaleh, and that he would be handling all
2  scheduled promotions going forward.

3  On February 2, 2017, SBA Lead Human Resources Specialist Jacquie Smith approved
4  Ms. Absouleh's promotion, as instructed by Raju. On February 3, 2017, Plaintiff contacted Ms.
5  Smith by phone to inform her that Ms. Absouleh was not eligible for the promotion, citing Ms.
6  Absouleh's below "Level 3" performance rating. The same day, Ms. Smith sent an email
7  following up on the call and cc-ing Raju, stating her department was not aware of any
8  performance issues, the promotional decision was approved by Raju, and that she had verified
9  Ms. Absouleh's performance rating was changed to a 3, such that her scheduled promotion
10 should have been approved. Raju subsequently emailed Plaintiff stating that he had told him on
11 multiple occasions not to further engage in the promotion decision regarding Ms. Absouleh and
12 asked Plaintiff to explain "why you would reach out to Ms. Smith and push this issue yet again?"

13 On February 6, 2017, Plaintiff provided Janu a statement regarding Raju's handling of
14 Ms. Absouleh's promotion, stating that "issues with [Ms. Absouleh] as well as management of
15 the office fall under" Plaintiff's job description, suggesting "that we maintain the required
16 supervision between my duties as supervisor and yours' as deciding official" and recommending
17 "we sit down and discuss this when you come in."

18 On February 16, 2017, Plaintiff sent Ms. Abousaleh a letter informing her that he would
19 be extending her six months leave restriction, which he put in place on August 19, 2016, for an
20 additional three months. The reason given was "because your attendance and leave record
21 continues to show need for satisfactory improvement. During this period, you had over 40 hours
22 of AWOL and unscheduled leave." The same day, Raju emailed Plaintiff directing him to
23 remove Ms. Absouleh from her leave restriction by 4 pm. Plaintiff came to his office at 4:30 and
24 advised that he would not be removing her from her restriction and would instead agree to the
25 three-month restriction with an option for Ms. Absouleh to appeal the decision. Raju emailed
26 Plaintiff stating, "this is clearly not what I asked you to do. I am again directing you to remove
27 Sabrina Abousaleh from all leave restrictions in their entirety and advise her of such today.
28 Please provide me with written communication that you have executed this directive." Plaintiff

did not do so.

Plaintiff was an employee pursuant to 5 U.S.C. § 7511(a)(1), with a compressed 5/4/9 work schedule, with the first Wednesday each month as his alternative work schedule ("AWS") day, which is an assigned day off. On February 24, 2017, Plaintiff went to an appointment and was not in the office during his scheduled time and did not submit a leave slip. On February 28, 2017, Plaintiff sent Raju a leave request for one week in March. Raju responded that a discussion was needed to ensure coverage was attainable and asked Plaintiff to submit a plan regarding staff scheduling. On March 1, 2017, Raju emailed Plaintiff about the expectation that he adhere to SBA policies and either be on duty or on approved leave during SBA's core hours.

Per SBA policies, employees submit time sheets online through an administrative officer, and after finalization and signature by the employee, the time sheet is reviewed and approved by the employee's supervisor. On March 3, 2017, Plaintiff submitted his electronic time sheet for pay period four ("PP4") of 2017 to the Administrative Officer, and Raju refused to sign it. On March 3, 2017, Raju again requested information about who would be in office during Plaintiff's requested leave, stating "core hours must be covered" and asking for a response by the same day. Plaintiff sent an hour-by-hour accounting for staff time as requested.

Later that day, March 3, 2017, around 6:30 pm Plaintiff met with Raju, and they discussed Plaintiff' timesheet and leave request, as well as an email Plaintiff had sent Raju. As discussed below, the parties dispute what took place in the meeting. Raju felt Plaintiff was aggressive and threatening, and filed a complaint with Federal Protective Services, emailed Regional Administrator Bob Blaney regarding the incident, and reported it to SBA's human resources.

On March 7, 2017, Plaintiff sent an email explaining the discrepancy on his timecard and stating "my regular timecard practice doesn't affect my submission as I often meet/exceed my 80 hour requirement as with this last pay period. You directing the [administrative officer] not to transmit my timecard is another harassing, provoking action creating a confrontation, hostile work environment between us." Also on March 7, 2017, Plaintiff sent the following email:

> you continue to make confrontational, harassing statements in an effort to discredit me and my work. . . I am supposed to be running

>the office and its employee (sic). You've also challenged my timesheets when I've shown you how I personal (sic) tracked my time to meet and/or exceed my required 80 hrs per pay period. I am consistently in the office every day unlike yourself. . . You've also withheld signing my leave slip for the wk of 13-24 March (submitted on 28 Feb) inappropriately citing staff coverage which is not correct. . . I rarely take leave. At this time I have 207 hrs of use/lose. I have sold my house in NC and need time to properly close out things. All of these actions by you are simply intentional harassment. . . As I mentioned to you Friday, if this continues, I will take my concerns to the Conflict Resolution Board.

After sending the email, Plaintiff entered Raju's office and asked if Raju had read it. Raju responded that he had not because he was working on something else. Plaintiff told Raju the email stated Raju was intentionally harassing him and that he would like to have a meeting with Bob Blaney. Raju again states Plaintiff was aggressive in this meeting, which Plaintiff disputes.

The same evening, Plaintiff sent an email to the Conflict Resolution Center stating Raju "has undermined my efforts as the office supervisor/mgr . . . and directly challenged my personal requests such as timecards and leave request. He is always provoking conflict, harassing issues between us . . . he has intentionally created [a] hostile work environment." He listed Raju not signing his timecard, not signing his leave request, directing him to submit a promotion for an employee who wasn't qualified, directing him to cancel his weekly staff meeting, holding staff meetings without him, and accusing him of not submitting requested reports as examples of "the issues."

On March 8, 2017, Plaintiff filed sent an informal anti-harassment complaint regarding the the 88 hours he worked in PP4 and Raju's failure to approve the timecard. The same day, Plaintiff approached Raju in front of employees Tom Martin and Roy Brady. He asked Raju if he had signed his timesheet and approved his leave request. Raju responded it was not the appropriate time and place to discuss the matter. Plaintiff insisted he answer his "yes or no" question and Raju advised Plaintiff that the leave slip was signed. Plaintiff accused Raju of creating a hostile work environment and stated that he had reported Raju to several people. Raju responded thank you for the information and the parties separated. As discussed below, the parties dispute whether Plaintiff's behavior was hostile or aggressive.

Raju reported the March 8, 2017 incident to Ms. Biaggi-Ayer, Chief of Workforce

1  Relations of the SBA. A Critical Incidents Response Team ("CIRT") was convened to gather
2  information about the incidents and complaints of hostile work environment. The CIRT did not
3  speak with Plaintiff before he was informed the same day in a letter from Robert Blaney that he
4  was placed on telework status and instructed not to report to the office until further instruction,
5  after the SBA assessed concerns regarding his behavior on March 3 and March 8, 2017. Plaintiff
6  was informed his duty and assignments would be unchanged.

7  On March 9, 2017, Plaintiff sent Raju an email regarding his timesheet, for "PP4," which
8  had still not been signed. He stated he had provided Raju with "more than enough information"
9  and stated, "you withholding signature and impacting my paycheck is further harassment on your
10  part along with the other things you have done in your short assignment in the office to
11  intentionally create a hostile work environment between us." Raju responded, stating there were
12  issues with Plaintiff's timecard including days/hours that Plaintiff was out for "medical/dental or
13  other appointments" during core hours, that this was not reflected in the time tracking system,
14  and that he had advised that he had worked 88.25 hours for PP4 but the online system only
15  reflected 80. Raju stated the timekeeping system was not able to process the time submitted due
16  to the discrepancy. He requested "a time report that is correct and reflective of the time you
17  worked. This will allow your time to be certified and processed accordingly. The reason for my
18  request is to ensure we are adhering to SBA policies and procedures." As discussed below, the
19  parties dispute whether the discrepancy identified by Raju was actually a violation of SBA
20  procedures or would have caused problems with processing Plaintiff's payment.

21  Plaintiff responded explaining that he generally used his official "AWS time" for
22  appointments "as I normally don't take my scheduled AWS day." He stated that as manager, "I
23  have always done this as it best meets the office needs while providing me a life work balance
24  that best suits me." He stated his "personal timecard accounts for my actual time so you as
25  supervisor know the hrs I've worked, which again always exceeds the required 80 hours." He
26  stated he changed his timecard as directed "to reflect the 88.25 hrs I did work . . . Not processing
27  my timecard impacts me getting my paycheck. This is harassment and an unfair labor practice."

28  On March 10, 2017, Raju responded asking for further clarification of the information on

1    the handwritten timecard Plaintiff had submitted. Plaintiff responded "your questions are
2    something we should have discussed Monday if you wanted clarity so as not to delay timecard
3    processing. I've always submitted my personal time with my submission . . . Again I recommend
4    I submit the first timesheet for 80-hrs with taking my AWS day so as not to confuse payroll."

5         On March 13, Plaintiff sent a complaint to Jospeh P. Loddo, cc'ing others including
6    Robert Blaney, regarding the timecard issue and the letter directing him to work from home,
7    seeking a resolution before he filed an EEO complaint.

8         On March 15, 2017, Plaintiff emailed Raju "redid my timecard for PP4. . . This only
9    reflects 80 hrs. Not what you asked for but the system should be able to process this." Raju
10   responded, clarifying that Plaintiff "cannot arbitrarily change the days and times you are in the
11   office, flex your hours, etc. Based on your schedule, your timecard must reflect the specific
12   number of 9 hours days, the 8-hour day and the one day off as agreed on" in Plaintiff's 5/4/9
13   schedule. Raju further explained that if his timecard did not reflect the time he was scheduled to
14   work, "you are to have a leave slip submitted for that time." Further, "all comp time and
15   overtime has to be approved in advance. . . you were not authorized in advance to work overtime
16   or comp time. If you have mission critical assignment that requires additional time, lets figure
17   out the best way to utilize our resources without violating agency policy." Raju sent another
18   email shortly thereafter stating, "you are on leave from 3/13 to 3/14/17. . . You are not to conduct
19   SBA business or act on behalf of the agency in your official capacity. You have earned that time
20   and should take full advantage of the time off. Stop conducting SBA business while on leave."

21        On March 16, 2017, Plaintiff responded, cc'ing others, stating:

22   > I certainly don't deserve this treatment. This is just another
23   > example of poor leadership on your part especially toward your
       fellow manager. . . your continued actions against me has created a
24   > hostile work environment between us. . . it's obvious that you've
       been on a mission to discredit me, my work, and that of the
25   > employees. This issue with my timecard is only the latest, even
       though you've signed similar timecards since January.

26
27        Plaintiff also referenced the March 8 letter "directing me not to come into the office for
28   unspecified actions by me on 3 & 8 March," Raju's withholding his signature of the leave
     request until the week of his departure, and stated "all of your actions toward me are provoking

(sic), combative in nature and again creating a hostile work environment. I will be filing with EEO and anti-harassment to address your actions."

He also contested Raju's issues with his timecard, but "to move the timecard issue forward so I can get a paycheck" attached a leave slip for hours missed on 2/24. He stated, "while you are my supervisor, I will strictly adhere only to the hrs on my AWS schedule." On March 21, 2017, Raju responded, "thank you for the information for PP4, that has been signed and processed based on the information you provided."

On March 19, 2017, Plaintiff filed an EEO complaint against Raju, citing the delay in the signing of his timecard, the letter from Blaney regarding his telework assignment due to the March 3 and March 8 incidents, and Raju's email advising Plaintiff not to conduct SBA business while on leave.

On March 27, 2017, Robert Blaney sent an email to the NDO office employees regarding an investigation of allegations of a hostile work environment that would be conducted by management from the CIRT. The email specified the investigation was a confidential matter that should not be discussed with anyone other than the investigators. Plaintiff also received an email scheduling his interview on April 5, 2017, and informing him the investigation was to remain confidential. On April 4 and 5, the CIRT convened the management inquiry regarding the allegations of hostile work environment. On April 28, 2017, and May 1, 2017, Plaintiff contacted three of his subordinate employees about statements they had given and the content of the management inquiry.

The management inquiry found that Plaintiff went to the SBA office at least 21 times during his telework assignment. On May 16, 2017, SBA Regional Administrator ordered Plaintiff to continue to only telework and stated failure to comply would result in disciplinary action. On October 23, 2017, Dorothy Overal, the SBA Oklahoma District Office Director and acting Regional VI Administrator, proposed Plaintiff's termination based on (1) lack of candor, (2) interfering with an official investigation (3) failure to follow supervisory instructions (4) failure to follow an established work schedule (5) failure to follow leave requesting procedures, (5) conduct unbecoming of a government employee, and (7) inappropriate behavior by a

supervisor. On December 15, 2017, the SBA issued its decision confirming Plaintiff's termination due to multiple acts of misconduct.

### B. Disputed Facts

#### 1. Ms. Abousaleh's Promotion

The parties dispute the date Plaintiff sent the letter to Ms. Abousaleh regarding his withholding her scheduled pay grade increase. Raju attests Plaintiff actually sent the letter on January 21, 2017, after he was directed not to be involved in the promotion, while Plaintiff attests, he prepared it the day it was dated, on January 19, 207.

Plaintiff also disputes whether Raju had the authority to grant Ms. Abousaleh the pay increase, and whether Plaintiff's contacting HR after being informed the promotion was approved was insubordinate. Plaintiff attests that Ms. Abousaleh had not satisfied the requirements for her pay increase, citing SBA policies, and that he contacted HR because he was never informed that Raju overrode Plaintiff's management decision to withhold her promotion, or that Ms. Abousaleh requested a review by higher authority as required by SBA policy. Plaintiff attests that he was withholding the promotion decision pursuant to his duty to "establish and maintain systems to effectively safeguard resources against waste, loss, theft, and unauthorize use or misappropriation" citing his job description.

#### 2. The March 3, 2017 Meeting

The parties dispute whether Plaintiff engaged in violent or inappropriate behavior in the March 3, 2017 meeting in Raju's office. Raju described Plaintiff as belligerent and using profanity and abusive language during the conversation, and said Plaintiff accused him of "executing an agenda on him," and that he twice asked Plaintiff to modify his tone and language. Raju attests Plaintiff brought down his tone, but it subsequently escalated again, and he asked Plaintiff to leave or conduct himself accordingly. According to Raju Plaintiff became very aggressive, and he asked Plaintiff to leave the office, and that Plaintiff "made an aggressive move toward my desk at which point I insisted he immediately leave my office."

In his declaration, Plaintiff attests "at no time during this meeting was my behavior inappropriate or violent. Raju clearly had irrational fears and reported his 'fears' to the

Defendants." He attests that Raju "lied about the circumstances to agency leadership and Federal Protective Services."

### 3. The March 8, 2017 Incident

Plaintiff contests Raju's assertions that Plaintiff was aggressive when he spoke to Raju on March 8, 2017. Plaintiff points to statements by employees who overheard or were present during the conversation, which were provided to Defendant by Plaintiff, as part of Plaintiff's EEO complaint.

Barry VanOrden stated he did not remember the date of the incident but recalls hearing a conversation between Plaintiff and Raju. He stated he remembered Raju saying, "please do not yell at me" and then Plaintiff responding, "I am not yelling at you, do I need a witness." He stated Plaintiff did not appear to be yelling and appeared to be talking in a normal tone.

Thomas Martin corroborated the discussion happened as Raju reported it but said, "although there was some confrontation the voices seemed to be in a normal tone.

Roy Brady who was present during the interaction said that he was talking to Raju and Ben when Plaintiff walked up, and when Brady was going to walk away, Plaintiff grabbed his arm and said, "I need a witness, or something to that effect." Brady corroborated the contents of the conversation but stated "there was no voices raised during this incident and no yelling was noted."

### 4. Time Card

Raju maintains that Plaintiff violated SBA policies and created his own flexible work schedule, took unauthorized time off for medical appointments, worked unauthorized hours, and often did not take his assigned AWS days off. Raju maintains that these discrepancies were the reason he did not sign Plaintiff's timecard.

Plaintiff contests Raju's statements, other than that he did not take his assigned AWS days off. Plaintiff attests he frequently worked more hours than the 80 hours required per pay period as part of fulfilling duties as a manager, and that all of his timecards were consistent with SBA policy. Plaintiff further points out that he underreported the hours he worked on his electronic timecard when he had actually worked 88.5 for PP4, and that had Raju signed the

initial reported 80-hour timecard there would have been no delay in his receiving his paycheck. Plaintiff attests that the system would have, in fact, been able to process his timecard, and that Raju's statements in emails that the system would not be able to process the timecard were false.

### 5. CIRT Report and Termination

Plaintiff does not dispute that he came to the office while placed on telework, but states he came to the office in the evenings after all employees had left to "sign pending issues/pick up additional work or conduct specific assignments he had been given by Raju." He points out that he was never banned from the facility, referring to testimony from Ms. Biaggi-Ayer from the deposition that was conducted in Plaintiff's Merit Systems Protection Board review of his termination.

Plaintiff further questions the integrity of the CIRT investigation and report stating he was never interviewed regarding the accusations against him, and that the CIRT never obtained Raju's report about Plaintiff to Federal Protection Services. Defendant contends he was interviewed as part of the investigation into Raju's allegations on April 5, 2017.

Plaintiff was interviewed on April 27, 2017 regarding his own EEO complaint, and in emails the following day recounting the interview and asking his subordinates for statements, he stated that that interview was the first time he learned of Raju's allegations against Plaintiff regarding March 3 and March 8, 2017.

Plaintiff also points to Raju's statements in the management review report where he stated he wore a Kevlar bulletproof vest to work out of fear of his safety, arguing this is evidence that Raju's "fears" were irrational.

Plaintiff lastly points out that the investigation leading to his termination never gave any weight to his response to the charges.

### III. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing the absence of material disputes of fact. Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to show specific facts demonstrating a genuine factual dispute for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

However, the nonmoving party may not merely rest on the allegations of his pleadings. He must produce specific facts by affidavit or other evidence showing a genuine issue of fact. Anderson, 477 U.S. at 256 (1986). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

IV. DISCUSSION

Defendants move for summary judgment on Plaintiff's sole claim for retaliation under Title VII. The Court now turns to the merits of Defendants' Motion.

Section 704 of the Civil Right Rights Act of 1964 (Title VII) prohibits an employer from discriminating against an employee because "[the employee] opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." U.S.C. § 2000e-3. The McDonnell-Douglas burden-shifting framework provides the test for whether a plaintiff can prevail on a Title VII retaliation claim. Stegall v. Citadel Broad.

Co., 350 F.3d 1061 (9th Cir. 2003), as amended (Jan. 6, 2004) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, Plaintiff must first make a *prima facie* case of retaliation under Title VII, by demonstrating that "(1) [he] has engaged in a protected activity, (2) [he] has suffered an adverse employment action, and (3) there was a causal link between [his] activity and the employment decision." Id. at 1065-66. If Plaintiff makes out a *prima facie* case of retaliation, the burden shifts to Defendants "to articulate a legitimate, non-discriminatory reason for the adverse employment action," Id. If Defendants do so, the burden shifts to Plaintiff to show that Defendants' proffered reason was "merely a pretext for a discriminatory motive." Id. (citing Manatt v. Bank of Am., N.A., 339 F.3d 792, 800 (9th Cir. 2004). The Court addresses each step of the McDonnel-Douglas framework in turn.

### A.  *Prima Facie* Case

The Court finds Plaintiff has made a *prima facie* case for retaliation.

#### 1.  Protected Activity

Defendants do not dispute that Plaintiff engaged in protected activity by participating in the December EEO investigation and lodging multiple informal and formal complaints against his supervisor, Raju, alleging that he was engaged in intentional discrimination and creating a hostile work environment. The Court finds that Plaintiff has established this element of his *prima facie* case.

#### 2.  Adverse Employment Action

Plaintiff asserts that Defendants engaged in three adverse employment actions: (1) delaying the approval of his timecard for eighteen (18) days during which he did not receive his paycheck; (2) placing him on telework pending investigation into Raju's allegations of misconduct; and (3) terminating him on December 21, 2017. Defendants dispute that the delay in his timecard approval and placement on telework are adverse employment actions as a matter of law.

An adverse employment action must be "materially adverse," meaning it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006). What is "likely

1  to deter" a reasonable worker from complaining is an objective test, but the perspective of a
2  "reasonable worker" must take into account at least "some individual characteristics of the actual
3  retaliation victim." Id. at 78-79 (J. Alito concurring). The Ninth Circuit has defined an adverse
4  employment action as one that "materially affects the compensation, terms, conditions, or
5  privileges of employment. Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008).

6  The Court finds that while the delay in the approving the timecard and telework assignment are not by themselves adverse employment actions, they are a part of alleged course of conduct leading up to Plaintiff's termination (an undisputed adverse employment action) and may be considered in that context.

### B. Causal Connection

Defendants argue Plaintiff fails to establish a causal connection between his termination and his protected activity of lodging complaints against Raju due to the temporal length between his termination in December 2017 and his participation in an EEO proceeding in December 2016. But temporal proximity is not the only evidence Plaintiff has provided, nor is his *prima facie* case dependent on the December 2016 proceeding as the only protected activity. The Court finds Plaintiff has established a genuine issue of fact as to whether Raju was motivated in his various actions taken against Plaintiff as his supervisor by retaliatory motive, based on protected complaints Plaintiff was contemporaneously lodging against Raju. For example, Raju continued to delay approval of Plaintiff's timecard and reported Plaintiff for aggressive and violent behavior while Plaintiff was sending emails to Raju complaining about his treatment of Plaintiff as "intentional discrimination" and creating a hostile work environment. Indeed, Raju reported Plaintiff, and that report led to Plaintiff being placed on telework pending an investigation that led to his termination, *the day after* Plaintiff sent an email directly to Raju accusing him of intentional discrimination and sent an email to the Conflict Resolution Center complaining of same. Similarly, Raju reported Plaintiff immediately after he told Raju that he had reported him to multiple higher ups for discrimination and creating a hostile work environment.

Plaintiff has raised a genuine dispute of fact as to whether Raju was motivated by retaliatory bias in "setting in motion a proceeding by an independent decisionmaker that leads to

an adverse employment action." Poland v. Chertoff, 494 F.3d 1174, 1181-82 (9th Cir. 2007). A reasonable factfinder could conclude from the record that Raju complained about Plaintiff's purportedly aggressive behavior—which other witnesses described as not in fact aggressive—in retaliation for Plaintiff's protected complaints against him. Under these circumstances, Raju's bias as a subordinate supervisor can be imputed to Defendants because a reasonable factfinder could conclude that Defendants' "allegedly independent adverse employment decision was not actually independent because the biased subordinate [Raju] influenced or was involved in the decision or decision-making process." Id. at 1182-83. Plaintiff's testimony that he was never given a chance to respond to Raju's allegations before he was ultimately terminated supports this finding. Accordingly, a reasonable factfinder could conclude Defendants' decision to terminate Plaintiff was influenced by Raju's retaliatory bias. Plaintiff has therefore met his burden to establish a *prima facie* case.

    **C.**    **Pretext**

Defendants assert that the decision to terminate Plaintiff was based on legitimate non-discriminatory reasons: failure to comply with his work schedule, leave requests, and time reporting; inappropriate, aggressive, and threatening behavior against Raju on March 3, 7, and 8, 2017; accessing the office while on telework duty and instructed not to come to the office; and contacting his subordinates regarding the CIRT investigation despite being told it was confidential. Although the mere existence of a *prima facie* case is insufficient to preclude summary judgment, a plaintiff "need produce 'very little evidence of discriminatory motive to raise a genuine issue of fact' as to pretext." Warren v. City of Carlsbad, 58 F.3d 439, 443 (1995) (quoting Lindahl v. Air France, 930 F.2d 1434, 1437 (9th Cir.1991)). "Any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder. Once a *prima facie* case is established . . . summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the elusive factual question of intentional discrimination." Warren, 58 F.3d at 443.

The Court finds Plaintiff has produced sufficient evidence to create a genuine dispute as to whether Defendants' reasons for terminating Plaintiff were pretextual. For example, he has

pointed not just to his own testimony, but to the corroborating testimony of other employee witness, that Plaintiff was not in fact aggressive or inappropriate on March 8, 2017, as Raju claimed. Likewise, Plaintiff has established a genuine issue as to whether his timecard issues were actually the reason Plaintiff was terminated, especially given the investigation that was commenced and led to his termination appeared unrelated to Raju's allegation that he was violating SBA policies regarding time reporting and scheduling. Similarly, Plaintiff has produced sufficient evidence that he spoke to his subordinate employees regarding the "confidential" investigation into his own EEO complaint, after learning for the first time the nature of Raju's allegation and knowing the employees would corroborate Plaintiff's version of events. A jury could find that seeking the witness statements of these employees was not a legitimate ground for termination, where Plaintiff was trying to present his case that Raju's allegations were false and motivated by retaliatory animus.

Accordingly, the Court finds genuine disputes of material fact preclude summary judgment on Plaintiff's claim for retaliation under Title VII.

## V. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendants' (ECF No. 78) Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that the (ECF No. 107) Proposed Joint Pretrial Order is **DISMISSED without prejudice.**

**IT IS FURTHER ORDERED** that the parties shall file an amended joint proposed pretrial order on or before June 2, 2025.

**DATED:** March 31, 2025.

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE